Good morning, Your Honor. Jeff Haldine on behalf of Appelrant's Mary Kensier and Lisa Kensier. Your Honor, am I going to start with my oral argument, or is everybody going to come up and introduce themselves? You know, I said that I'd like both of you to come up and say who you are and who you represent. I thought that's what I said. Right. Sorry, Your Honor. My name is James Pranger, and I represent Appellee Daniel Finnegan, who is the successor trustee of the Stefani Family Trust that's at issue here. Good morning. Good morning, Your Honor. John Brooks on behalf of the Salvation Army, the original sole residuary of Appellee Daniel Finnegan. Good morning, Your Honor. Jason Orwell here with Jeff Haldine on behalf of the Appellant's. Thank you. Counsel, whenever you're ready. This is a recording device, it's not an amplifier, so keep your voice up so we can hear you. Will do, Your Honors. Good morning. May it please the Court, Jeff Haldine on behalf of the Appellant's. Your Honors, I'd like to reserve five minutes for rebuttal. Your Honors, the facts of this case are relatively straightforward and undisputed. Mr. and Mrs. Stefani, during their lives, created a trust. When Mr. Stefani died, that trust was divided into three sub-trusts. Two of those sub-trusts became irrevocable. One of them remained revocable by Ms. Stefani. The question in this case, the issue in this case, is whether when Ms. Stefani executed an amendment that proposed to amend the entire trust, that is all three of the sub-trusts, whether that amendment should be given partial validity as to the one trust that was revocable, or whether it should be held entirely invalid. Now, Your Honors, the controlling authority is a line of cases that's discussed in the Senate Supreme Court's decision in Williams v. Quickman. In that decision, the Court held that part of an instrument may be declared invalid and the remainder allowed to stand where, one, the invalid portions can be separated from the instrument as a whole, and two, without defeating the intent of the testator. Mr. Haldane, if you separated the invalid portions under the facts of this case, what would be the valid portions that are left? I'm glad you raised that point, Your Honor. I know that the appellees have raised an argument that recognizing the partial validity requires that the Court basically go through and only delete language, but that's not what the Supreme Court said in Williams v. Quickman. In Williams v. Quickman, it said that the So, you're right, we cannot go through this trust and simply delete language and leave language in there that's going to get to where we want. However, the exercise of Ms. Stefani's power under the trust amendment can be separated when you view these two instruments as a whole. Let's talk about the intent. How do we get to the intent of the testator here? By the language or by what we think the testator wanted? Well, I think we go by the language of both of the trust instruments. Okay, so the language of the amendment says what exactly? I want to amend the entire trust. It doesn't refer to living trust at all? Well, do you mean the survivor's share? No, no, there was an original trust. Correct. Then there was a family trust and two survivor trusts. Correct. The original trust was called, what was the name of the original trust? Ms. Stefani Living Trust. And is that name used in the amendment? Yes. So we're talking about the original trust? Right. Okay. So the intent of that language is to amend the living trust. To amend the entire original living trust. Okay. That was the intent of the amendment. And at that time were the family and the survivor trusts funded? No. The SEM trusts were not funded until Ms. Stefani died. And Judge Riley basically took Ms. Sterfinigan's accountings and ordered Ms. Kinzier to fund those two trusts. Was there any objection to that? There were not really any objections. There were some issues that were briefed in connection with that, but it was mostly done by agreement of the parties. All right. So let me ask you a hypothetical. What if she never funded any of the family or survivor trusts and there wasn't an agreement to fund, would there be an issue relative to the unfunding of those trusts initially? She never funded them, right? That's right. Right. So what's the effect of an unfunded trust? Does it exist? Well, I believe that it does exist. The trust instrument itself says that upon Geno's death or upon the first spouse's death, that then the trust divides into three trusts. I understand that. It divides into that, but without the funding, what's the effect of that? I think that you just have basically one trust that holds all of the res, and you have these three sub-trusts that have not been funded, but they exist. Okay. And all of those sub-trusts have now been funded. I understand that, but that was my hypothetical. They were never funded, ever funded. What would be the effect of that? Everything would go by the living trust upon her demise, not the sub-trust, correct? I'm not sure I understand the question. Move on. Thank you. Okay. So I believe I was at the point where I was describing that this can be separated, and under Williams v. Crickman and First National Bank of Joliet v. Hansen, we believe that because the trusts are clearly distinct from each other,  insofar as it amended the trust over which Ms. Stefani clearly had the power to amend, but it is just not given effect as to the two irrevocable sub-trusts containing Geno's contributive share. Well, as far as the fact of Hansen, wasn't that the rule against perpetuities, that was the invalid clause in that? That's right. So on the facts, it's so different than what we have here, is it not? The facts are different. On the other hand, the case was cited for the proposition that courts are willing to take a look at these instruments and say, look, we understand that this one provision is invalid, but we're going to give effect to the remaining provisions, because we're going to try to effectuate those intent to the greatest extent possible. That was one instrument, correct? Now we're dealing with four here, practically. That was one instrument in the Hansen case? Yes. And we're talking about one instrument in this case, we're talking about the amendment that Ms. Stefani... I know, but the effect is on really three other instruments, correct? No, because all of the other three sub-trusts were created by one instrument, the Stefani Wittig Trust. Thank you. I wrote a question out, which I'd like to ask. Based on the provisions of these trusts, the provisions that took effect at Gina Stefani's death, can the survivor trust number one be severed from the family trust, and survivor's trust number two, without effecting the remainder of either of these trusts, or the remainder of the entire trust? I'm following, I believe, Hansen in asking that question. Can the trust be severed? Can the survivor trust number one be severed from the family trust, and trust number two, without effecting the remainder of either of those trusts, or the remainder of the entire trust? Yes, I believe that they can. And I believe that that has already happened, because Judge Riley has ordered Ms. Kensier to transfer and fund the family trust, and the survivor's share, too. So all of these trusts exist as separate trusts, fully funded, and they can be treated as distinct entities. And I believe that they're being held by Mr. Finnegan in separate accounts, so they have already been parted. We can give effect to Ms. Stefani's attempt to amend the survivor's share one, while not giving effect to her attempt to amend the other two subtrusts, and everything will work out just fine, because the assets have already been segregated. And so you're not effecting the entire trust. You're not effecting all three subtrusts by giving effect to the amendment, insofar as it only applies to the survivor's share one. Does that answer your question? I'm not sure. I listened to the other side. I think they might have a different opinion. But her intent was to change the living trust, the first trust, right? That was her intent. Right. So don't we go by what her intent was, and not what's happened subsequent, when a court did something and XYZ happened? Well, her intent was to amend all three of the subtrusts, but like I said, under the Where'd you get that? Well, when she says she's trying to amend the entire Stefani Living Trust, the original trust, that was basically an attempt that Ms. Stefani made to amend all three of the subtrusts, because all three of those subtrusts exist under the Stefani Living Trust master document. Couldn't this have been done a lot differently by the attorney or whomever prepared this document? It could have been done a lot better by the attorney who prepared the document. That's the problem that we have here. Was it the same attorney that wrote the original document? I thought I read somewhere in here. Yes, the attorney who drafted the original Stefani Living Trust. I guess enough time must have passed that you forgot what he wrote. It was in 1997 that he drafted the original trust. Stefani returned in 2011, and he did not advise Ms. Stefani at that time that the assets should have been divided and put into these subtrusts since Gino had died, and he also committed this drafting error in the amendment. Can I ask you not that it makes any difference? How old was she at the time of the 2011 amendment? She would have been approximately 90, 91, I believe. Thank you. Your Honors, I guess the only other point that I wanted to make is that what we're asking the court to do here is similar to the power of appointment cases that we cited, where they will hold an overly broad exercise of a power of appointment and basically give effect to it to the extent that they can and then toss out the bad. I mean, really what we're talking about here is do we need to throw the good out with the bad, and I don't think that we do. The final point that I would make is that I know that I have a question because your opponents make a point of, you know, highlighting that argument or response to that argument, and I asked you this earlier, and I'm not sure if you gave me an answer that's satisfactory. If you throw everything out, I think we can all agree that she had no power to amend the overall trust. So if you have, if we accept that and you throw out the bad part, what's left? You're asking us, when we write an opinion, we have to write something. What would we write that would leave the third part that you're trying to have us leave intact? How would we do that? You know, this is very puzzling to me. I want you to be as specific as you can in terms of what is left if we throw out the parts that we all agree, I think you and your opponents agree, that she had no power to amend the overall trust. If we do that, what's left? And I think, Your Honor, that this goes to the point that we're not saying that we can just delete a certain phrase or that we can delete a certain number of words from the instrument. I'm not even limiting it to phrases. Any configuration that you think gives you the results you want, that's what I'm trying to get you to explain to me. What would that configuration look like? Well, the configuration would be that Ms. Stefani exercised this power to amend the trust, and when she did that, that that power was valid as to the revocable and amendable trust containing her contributive share. But it's invalid as to the share containing Gino's contributive share. And so it's more of an operation of law type thing. She had the power to do A, so we're going to give effect to that, but she didn't have the power to do B, so we're not going to give effect to that. Well, Counsel, doesn't the amendment remove the Salvation Army as a residual beneficiary? It does. So that's a pretty big change. That's a big change. Okay. It gives to other charities and other friends that it doesn't give to before. That's correct. Right? And then the residue allocated according to 10 percent charities and then 12 percent, 12.5 to friends. So that's a change as well. Correct. So there's some substantial changes from what the original living trust was, correct? That's right. And so maybe it's... Did she have, that was her intent at the time that she made this amendment? Right. And so what we are asking for is to take Ms. Stefani's contributive share, all of the assets in the survivor's share one, and distribute them according to the trust amendment. So the Salvation Army wouldn't get any of those assets, and the charities and friends that are identified in the trust amendment will get those assets. However, because the trust amendment was invalid as to the survivor's share two and the family trust, those will continue to pass by operation of the original Stefani Living Trust. That means that the Salvation Army will get all of the residue and the specific gifts to other individuals will be made from that trust. I'd like you to respond to... Go ahead. I'd like you to respond to Judge Riley's, basically the core of his ruling was, she tried to do something that she had absolutely no power to do, so everything she did was ineffective. If that's true, then it leaves the trust in effect the way it was, which is unfunded. All those three things are unfunded. So where does that leave you? Can you respond to that? There is case law that supports what the judge did, and certainly your opponents have cited that. So I'd like you to respond to that, because that's the crux of your case, counsel. Your Honor, and she did do something that she couldn't do. She did something that she didn't have the power to do. But the issue here is whether we can separate that out and keep what she could do. So we understand, and we've never disputed, that Ms. Stefani did not have the authority to amend the two contributive shares, or the two sub-trusts that contain Genome's contributive shares. But since she didn't have the power... But if that's what you would like it to say, but what it does say, the 2011 amendment said, quote, trust or desires to amend and restate the entire existing trust agreements. Right. Which she clearly couldn't do. Correct. But you're saying she desires to amend and restate some portions, or the other trusts, or what? We're not saying that she... But it's not expressly given to her under the trust. Right. We're not saying that she said that she was just trying to amend her trust, but we're saying that if she expressed her intent that she wanted to amend the entire trust, we can give effect to that insofar as it will amend her contributive share, but it will not amend her husband's contributive share. What you're asking us to do is that you're asking us to give effect to that and basically say, okay, she's trying to amend the entire thing. She doesn't have the power to do that. But since she had the power to deal with her own trust, we'll just read into it that that part is carved out. That's what you're asking us to do, as I understand your argument. And I am trying to find out by what authority do we do that. That's my question. Your Honor, I would tell you that the Williams v. Quickman case is the authority by which you would do that. And it's just simply a matter of giving effect to the valid portion while not giving effect to the invalid portion. Thank you, counsel. Thank you, Your Honor. Counsel, are you both going to argue or are you going to? Yes, Your Honor. Our plan is to split our argument time equally. Okay. Thank you. Please state your name if this recording is used. Yes, Your Honor. My name is James Springer, again, and I represent Appellee Daniel Finnegan, the successor trustee of the Stefani Family Trust. Also in court today is John Brooks, as we know from his introduction before, who's counsel for the Salvation Army. And as I said, we're planning to split our time for argument equally. I am planning to address the underlying facts and the trust construction issues while Mr. Brooks will address the trust reformation and related arguments. Just to clarify a couple of the facts that were addressed in Mr. Haldane's argument, in addition to the two irrevocable sub-trusts and the one sub-trust that might have been revocable at the time of Geno's death, the Living Trust also provided for $165,000 in specific requests, and those were to be made upon the death of the surviving spouse upon Evelyn's death. And, again, Evelyn's attempted 2011 amendment of the entire existing trust, which she specifically describes in the document as the 1997 Living Trust, her attempt to amend doesn't address or deal with those $165,000 in specific requests at all. And, again, the way she wrote it, it would just write them out completely. So that's another element of irrevocable aspect of the original Living Trust that her amendment fails on, in our opinion. An additional fact that's important to focus on, as everyone admits, after Geno's death, Evelyn failed to fund the sub-trusts, and she failed to segregate the trust assets in any way. Instead, she used the same lawyer who drafted the original amendment to attempt to amend the entire existing trust agreement, as I said before, defined as a Living Trust. One of the things that troubles us about this case is that Evelyn tried to do something that we're saying is completely invaluable and should be thrown out. The Kenzeo parties and the beneficiaries of the 2011 attempted amendment are not without a remedy. As Your Honors raised the question, where is this drafting attorney now, it's in your record of appeal that there is a malpractice action being pursued by the Kenzeo parties against him, which could be their adequate remedy to address the issues that they have. The parties concede that Evelyn's intent expressed in the 2011 document was clear. As Appellants Counsel admitted in the trial court, the plain intention is she intends to amend the entire trust, and it's also uncontested that Evelyn behaved consistently with that intent. Before she died as sole trustee after Gino died, she, all the way to her death, administered the trust as a single fund, no segregated assets, a single accounting. She did not abide by the terms of the Living Trust regarding the segregation and the funding of the subtrust. So if we were ever going to look at extrinsic evidence of what her intent was, that was the extrinsic evidence. We can see that her intent was to amend the entirety and not any sub-part. Kenzeo's first argument that we've heard is that the court should construe Evelyn's intent in the 2011 document to be something other than what the document unambiguously states her intent to be. Our position is that we are bound by her intent, that we cannot rewrite her intent. If we try to separate the invalid provisions, you might ask the question, what is left? This isn't a case like the severability cases that we saw. This isn't a case where you can take out a single gift provision that's invalid or a single term that's invalid. This is a case where her basic statement of intent that infuses the entire agreement is invalid, and that we cannot do. Plus, we really don't know what her intent would have been. Kenzeo says, well, obviously her intent, if she knew she couldn't have amended the irrevocable parts, then she must have intended to amend just Survivor's Trust 1. We don't know. That's a guess. I have one question for you. Mr. Howden, he didn't phrase it this way, but he's making an equitable argument. He didn't phrase it in those terms, but that's part of how I construe it. And that is, clearly she has the right to do whatever she wishes in terms of the third trust. And if that trust is now funded and that trust really is under her power, why not allow that trust to stand on its own and carve it out from the body of these other overall, the single trust and the other two? Why not? Well, I guess the first issue I have with that, Your Honor, is the idea that the history of the law on trust and on trust construction is pretty strict, and there are very limited circumstances where we can construe or reform a trust. And those circumstances often run afoul of what we might consider the most equitable result. But the rules are pretty strict, and the rules don't allow us to ignore her expressed intent to do something else. And the assumption that's being made here, and I think it's the flaw in Mr. Howden's argument, the assumption being made is that if she had known and understood that she couldn't amend the two irrevocable sub-trusts, that she would have still done exactly what she did, but only with respect to the sub-trust she could amend. We have no idea if that's true. We're talking about half the money. We have no idea if she would have said, I don't want to amend this at all if I can't do the whole thing. We have no idea if she would have used exactly the same distributions that she attempted to make in amending the one she could amend. Or she might have done different ratios or different amounts or different balances. We really don't know that, and that's the big problem here. We are bound by her intent, and her intent is clearly and unambiguously stated. Would that affect the amount of money that's in these now, three segregated trusts? If we, as we tried to do in the trial court, we went back and we tried to retroactively account, and we figured out what should have been put into the family trust first, and we did that. We figured out what should have been put into the other irrevocable survivor trust number two, and we did that. What was left was what would have been in survivor trust number one. So in terms of what assets she would have had to distribute, yes, we can answer that question. But in terms of how she would have distributed those assets, if she was only attempting to distribute those specific assets, we have no idea. Yes, she might have done exactly what she tried to do in terms of ratios and who gets what. She might have done something differently. She might have not done anything at all. We don't know the answer to that, and we can't guess. We can't pull ourselves in her shoes and try to say, this is what we think she would have done. That's the slippery slope that the courts have always said we can't get into. Counsel, would we be carving out some kind of exception here as far as the rules of trust construction if we agree with the appellant as far as our analysis? I believe we would, because I think the only way you can give effect to what counsel is asserting is to either construe a trust where there is no ambiguity, which would be definitely an exception in carving out a new rule, or to affirm a rule substitute that doesn't meet the exceptions to the rule that a rule substitute can't be reformed. So I think, yes, we don't see a way to do it. We don't think it can be done. In addressing whether there was an ambiguity in terms of any ambiguity, it would have to either be patent or latent. And to make sure we all are on the same page, if Evelyn had said, I intend to amend one of the three subtrusts without stating which one, we might have a patent ambiguity because on its face you can see when she says, I intend to amend one of the three subtrusts, but she doesn't tell us which one, we don't know what she's trying to do. That would be a patent ambiguity. Then we could do a trust construction. That's not what happened here. By the same token, if she said, I intend to amend the subtrust, that sounds on its face like a clear statement, but extrinsic evidence would tell us there's more than one subtrust. We don't know which one she intended to amend. That would be a latent ambiguity. If we had a patent ambiguity or a latent ambiguity, we could talk about a trust construction. But in this case, we don't have either of those. We have clearly stated intent. I intend to amend the entire existing trust agreement, which she describes as the September 10, 1997 Living Trust. So that's why I say, Your Honors, we can't construe in this case without going out of the bounds of what construction is supposed to cover. And I would add, if there were an ambiguity and if we were to look at extrinsic evidence, the cases say you can only look at the, you can't use the extrinsic evidence to alter or amend what is clearly stated. You can only use it to explain. But in any event, if we look at the extrinsic evidence in this case, what is the extrinsic evidence of Evelyn's actions, it's to treat this entire thing as one trust. It's to amend the entire thing. There is no extrinsic evidence that supports Mr. Helding's position. So again, on the construction side, we believe there's absolutely no basis to do a trust construction here. I think the only reason this case is so troubling to us is that Evelyn unambiguously attempted to do something that was legally invalid, and that bothers us. But the law is clear on this point as well. The first district in the Miller Lake School stated that any presumption that a settler would intend a valid versus an invalid action cannot override the clear language of the document. And as the second district stated in the Miller versus O'Neill case, the presumptions of validity versus invalidity and the other presumptions only apply once you already have found that there's an ambiguity. So again, with no ambiguity, there's no construction here. To conclude my point, Your Honor, my points, Your Honors, we cannot guess, and we should not try to guess, what Evelyn might have done had she had a different understanding than the one she had. We have to stick with the intent that she expressed and what she stated. And that intent is invalid. It invalidates the 2011 document, and we believe the trial court was correct on that point. The only way, other than a construction, that you could address this issue in some way that Mr. Haldane would try to assert we should address it would be to consider whether we could reform the trust, actually add new words, write new language into it. And on that issue, I turn it over to Mr. Brooks. Thank you, Mr. Greenberg. Thank you, Your Honor. Good morning again, Your Honors. John Brooks on behalf of the Salvation Army, the original sole residuary beneficiary of the Stefani Trust. Mr. Pranger addressed the issues related to a construction. We don't believe this is in any way a construction. It seems to us a clear attempt to rewrite the language that Justice Harris read to us just a minute ago that said she intends to amend and restate the entire trust. They need to amend that somehow. They need to reform it. They need to rewrite this will substitute. And I'd like to be clear that this is a will substitute under the definitions in the case law and the restatement third property. She retained, Mrs. Stefani retained the beneficial enjoyment and possession of the property during her life. And at her death, it was to go to Doniz and shift to them outside of the probate process. One case we would really like the court to note is the Handelsman case, a 2006 case from the second district cited in our papers. We'd like to draw the court's attention to it for a couple of reasons because it is a trust that is a will substitute that parties attempted to reform. Even though there was clear attorney error there, just like there is in this case, the court refused to do so, just like Judge Riley did. And they applied the law of wills in doing so to this will substitute. The restatement of trusts is cited in that case. They say that the wills and will substitutes are fundamentally alike. Important policies and property rights shouldn't be determined by a mere choice of form as to a will versus a trust. So we believe the law of wills applies to this case. And other appellate courts around the state have applied the law of wills to will substitutes, including this court, generally in testamentary capacity type cases. Illinois has a long history of prohibiting the reformation of wills. The history of what we refer to in our papers as the no modification or no blue pencil rule dates back to at least our Illinois Supreme Court in the Kurtz case in 1870. And, of course, that case cites even older authority and refers to English common law. Often the cases turn out to be property that the testator was trying to devise that they didn't know, and they're often real property cases with poor descriptions. And that's sort of what we have in this case. Mrs. Stefani is trying to give away property she doesn't control. The rationale behind the rule prohibiting judicial reformations is that the use of extrinsic evidence to deviate from the unambiguous terms would flout the statutory requirements that wills be in writing and written by the testator and not someone else. And a different policy would open up the virtual floodgates, as they say, to litigation because everybody would be able to point at clear language and say, no, that's not what they meant. Here, I have some extrinsic evidence that will explain it. But that's what the Kensio parties are asking this court to do. In the Hannisman case, they cited a little bit later case, the Decker case from 1887, since the effect of allowing the reformation of a will substitute is similar to that allowing the reformation of a will, and that would enable a stranger to the original proceeding to make a will substitute, as in this case, for the set law. That court also said, every consideration impels us to deny the power of courts to add to or reform a will on the grounds of mistake. The Graves case is along the same lines. It quotes that mistakes and inaccuracies can't be corrected by extrinsic evidence and says that the principle is firmly established and familiar. In other words, our Illinois Supreme Court has reminded us over and over again that fixing the mistakes of testators or set laws is a temptation to be avoided. It's a jury not to be let out of the bottle lest we write the words for them. Did your opponent address the Hannisman case at all in their reply? I believe they did. They concentrated more on actually things that your honors have asked questions about. I just don't recall, so that's fine. There's no modification or no blue pencil rule, I'll say, like most rules, has a couple of exceptions. They're very narrow, and we don't think they apply. The first one's sort of the easier one. It's for Scrivener's error. We know the Scrivener's error is it's a minor inadvertent mistake, transposing two numbers or letters or something. But it's mechanical in nature. It's not judgmental. It's not the product of a lawyer's thought. And here we have a quote. I intend to amend and restate the entire existing trust agreement. This is not a Scrivener's error. This is an error, as they concede, in professional judgment by the drafting attorney. Now, the second exception is what I call the deletion exception. It's an awful lot like their argument related to the severability clause and very similar to their argument about overly broad powers of appointment. The basic rule is if a description is partly false and a word or a phrase can be stricken and leave enough of the gift that you can identify the gift, and if you leave enough of an operable document to work, then you can do it. And I believe that goes to Justice Cunningham's question is what do we have left if we strike this? If we strike the sentence that says I, the set lawyer, intend to amend the entire existing trust agreement, what's left? Well, you're left with a few pages that have some trustee powers, and so it talks about some gifts, but there's no direction from the set lawyer. There's no subject or verb to this sentence. It's just a list with no direction. So we think that if you delete that, you have a legal nullity. And you can't go back and add the words except for survivor trust two and except for the family trust and except for other specific gifts that I can't amend. We can't put those words in there because then the court becomes the stranger writing the real substitute for Mrs. Stefani. Counselor mentioned the Hansen case and the Williams case. Those cases, in the Hansen case, it was, I believe, as Justice Connors mentioned, it was a perpetuities clause problem. They struck the perpetuities clause, but they still had a valid trust. In the Williams case, it was really an under-influence case, and the question was can the court invalidate one particular gift under a will based on under-influence and leave the rest of the will intact? The answer was yes, but it was one gift in a long list. You could strike that and leave a valid will. The power of appointment analogy, we believe, suffers from the same infirmity. Even the restatement third property definition that they cite says if part of an appointment is ineffective and another part, if standing alone, would be effective. In other words, I appoint to A, B, and C. C is invalid, so you can strike it. That's not our case. The Hopkinson case that they cite talks about the ineffective portions as being clearly separable, entirely distinct. On that subject, a little closer to home, this court decided last year an overly broad power of appointment case in the Harris v. Powers matter. We had an overly broad attempt to exercise a power that at least theoretically would have allowed assets to go to creditors who were impermissible appointees. Well, neither the trial court nor this court attempted to rewrite that power of appointment to contain it to only permissible appointees. It was stricken as invalid and not rewritten. So, thank you so much, Your Honor. Thank you. Thank you.  Yes, Your Honors. In rebuttal, I just wanted to address a few points. One point is that this is not a trust reformation or a trust construction action. I know that a great deal of the argument that was just given addressed this problem underneath those rubrics, but we have never contended that there's any ambiguity in the amendment that needs to be construed, and we've never asked the court to reform the language in there. We're just asking the court to say, we will give legal effect to this instrument to the extent that it did what Ms. Stefani had the power to do, and we're not going to give effect, legal effect, to the extent that Ms. Stefani did something that she couldn't do. So, the reformation and the construction analyses, I believe, have no bearing on the court's decision here. Addressing the Towers decision. Based on that statement, if we agree with you, we can't do, we can't give her the power to do what she didn't have the power to do. Well, Your Honor, the argument that we've made is that she exercised the power of appointment to amend the entire trust. She didn't have the power to do that, but she did have the power to amend the trust containing her contributed share. We're just asking for that to be given legal effect while the remainder of the, and this is the power of appointment analogy. The Hopkinson case says that when you exercise a power of appointment in an overly broad fashion, that the court tosses out the excess attempt at exercising the power and gives effect to the portion that's within the power. So, what we're saying is this here, is give effect to what Ms. Stefani did in the amendment, to the extent that she had the power to direct what would happen to her contributed share of her property. Don't give effect to the excess exercise. And then I just wanted to address briefly the statement regarding the malpractice claim. We have filed a malpractice claim against the insurer. There is not enough insurance to satisfy the entire amount of our claims. So, if the decision below is affirmed, we're not going to be made whole. We do not have an adequate remedy. Thank you, Your Honors. Thank you very much, counsel. Thank both sides for their argument. The matter will be taken under advisement. Court's adjourned.